PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 17-2607
_____

PENNSYLVANIA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
                                        Appellant

v.

TRAINER CUSTOM CHEMICAL, LLC;
JAMES HALKIAS; JEREMY HUNTER
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2-15-cv-01232)
District Judge:  Hon. Eduardo C. Robreno
_____

Argued
July 16, 2018

Before:  JORDAN, SHWARTZ, and KRAUSE, *Circuit
Judges*

(Filed: October 5, 2018)
_____

Alexandra C. Chiaruttini, Chief Counsel
Douglas G. White, Supervisory Counsel  [ARGUED]
Brian G. Glass
Pennsylvania Department of Environmental Protection
2 East Main Street, 4th Floor
Norristown, PA 19401
	*Counsel for Appellant*

Lloyd R. Hampton		[ARGUED]
Hampton & Hampton
400 Broad Street
Route 61
Ashland, PA 17921
	*Counsel for Appellees Trainer Custom Chemical, LLC
	and Jeremy Hunter*

Joseph A. Malley, III
Law Office of Joseph A. Malley III
15 East Second Street
P. O. Box 698
Media, PA 19063
	*Counsel for Appellees Trainer Custom Chemical, LLC
	and James Halkias*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

We are asked in this interlocutory appeal to decide whether the owner of a piece of land is liable for the costs of

an environmental cleanup that took place there before the owner acquired it. Our answer is yes.

Trainer Custom Chemical, LLC ("Trainer") acquired a property known as the Stoney Creek Site (the "Site") for $20,000, after Pennsylvania's Department of Environmental Protection ("PADEP") had already incurred over $818,000 in environmental cleanup costs at the Site. The cleanup costs continued to mount following Trainer's acquisition of the property, both because of pre-existing pollution and because buildings on the Site were demolished by one or both of Trainer's principals, Jeremy Hunter and James Halkias, which caused further contamination.

PADEP sued Trainer, Hunter, and Halkias for violations of the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601-28,[1] and Pennsylvania's Hazardous Sites Cleanup Act ("HSCA"), 35 Pa. Stat. §§ 6020.101-.1305, and sought to recover all of its response costs related to the Site, regardless of when those costs arose. At summary judgment, the District Court drew a temporal line, holding Trainer liable under both statutes for the response costs incurred after Trainer took ownership of the Site but not for the costs that arose before. Although the Court directed the parties to proceed to trial on damages, PADEP disagreed with the temporal distinction drawn by the Court and filed this interlocutory appeal.

---

[1] CERCLA § 1 et seq. is codified at 42 U.S.C. § 9601 et seq.

3

We conclude that a current owner of real property is liable under both CERCLA and HSCA for all response costs in an environmental cleanup, including costs incurred before the owner acquired the property. Accordingly, we will affirm in part, vacate in part, and remand for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A.   Facts

#### 1.   The Site Before Trainer Acquired It

The Site is located in Trainer Borough, Delaware County, Pennsylvania. In 2007, it was owned by Stoney Creek Technologies ("SCT"), which primarily used it for making corrosion inhibitors, fuel additives, and oil additives. Buildings and equipment used in creating SCT's products were located on the Site, including a laboratory and a water treatment facility. SCT also kept various hazardous substances at the Site, including about three million gallons of flammable or combustible chemicals that posed a threat of release, and over seventeen million pounds of other chemical inventory, which included flammable, combustible, and corrosive chemicals.

PADEP investigated the environmental risk at the Site and determined in 2007 that "there is a release or threat of release of hazardous substances or contaminants, which presents a substantial danger to human health or the environment[.]" (App. at 34.) Accordingly, PADEP and the

4

United States Environmental Protection Agency ("EPA") initiated removal actions.[2]

SCT was in financial trouble and could not afford the expenses involved in the cleanup. One such expense was for the electricity to power pollution control and security equipment, including a vaporized nitrogen system. The nitrogen system was necessary to minimize the threat of fire posed by the flammable and combustible chemicals on the Site. Due to lack of payment, the power company was going to shut off the electricity to the Site, so PADEP assumed responsibility for paying the electrical bills.

## 2. Trainer's Acquisition of the Site

The same financial straits that had apparently led SCT to fall behind in paying for electricity also led it to become delinquent in paying real estate taxes. Consequently, the Tax Claim Bureau of Delaware County forced a sale of the Site. In what was evidently a coordinated effort, Hunter and

---

[2] Generally, "removal actions are short term responses to a release or threat of release while remedial actions involve long term remedies." *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 293 (3d Cir. 2000) (citation omitted). "The statute defines 'response' as 'remove, removal, remedy, and remedial action[.]'" *Id.* at 292 (quoting 42 U.S.C. § 9601(25)). The record contains some inconsistency as to when removal actions at the Site began. For example, one report indicates that the EPA began its response in October 2008. Nevertheless, it is undisputed that removal actions commenced before Trainer became the owner of the Site.

Halkias purchased the property and put its title in Trainer's name. Hunter signed the purchase agreement, the recitals of which plainly stated that the Site had ongoing "environmental issues ... [and] environmental remediation." (App. at 53.) Despite that warning, on October 4, 2012, Halkias tendered a cashier's check for $20,000 and a handwritten note indicating that the deed to the property should be made out to Trainer Custom Chemical LLC. The next day, Halkias and Hunter officially formed Trainer Custom Chemical LLC by filing a Certificate of Organization with the Pennsylvania Department of State. On October 9, 2012, the deed to the Site was executed and put in Trainer's name.

### 3.    The Site After Trainer Acquired It

The EPA and PADEP completed their removal actions at the Site on December 12, 2012.[3] But that was not the end of the problems there. After Trainer acquired the Site, either Hunter or Halkias or both – they point the finger of blame at each other – demolished many of the Site's structures. Regardless of who was responsible, it is undisputed that metals and other salvageable materials reclaimed from the Site were sold for at least $875,000 to JK Myers Contracting, a business that Halkias had registered with the Pennsylvania Corporations Bureau in April 2012.

---

[3] There is some ambiguity in the record on the date of completion. PADEP's reply brief notes December 10, 2012 as the date of completion, but an EPA website referenced in the briefing indicates the date to be May 2, 2013. The discrepancy is immaterial to this case.

In June 2014, PADEP received two reports assessing environmental concerns at the Site. One noted that "[t]he []EPA has acknowledged that hazards still exist at the Site[.]" (App. at 61.) The report further said that, during a recent visit to the Site, PADEP "observed active demolition activities being conducted on several structures throughout the Site[,]" and "[s]everal storage tanks were observed to be cut open and unknown contents were noted to be spilling onto the ground." (App. at 62.) The other report indicated that buildings on the Site had asbestos-containing materials that needed to be removed before demolition.

### B.    Procedural History

PADEP sued Trainer, Halkias, and Hunter under CERCLA and HSCA to recover the costs incurred in cleaning up the Site. The complaint was in six counts: separate ones against each of the three defendants under CERCLA § 107(a), 42 U.S.C. § 9607(a), and, again, separate ones against each of them under HSCA §§ 701 and 702, 35 Pa. Stat. §§ 6020.701, 6020.702.

Eventually, PADEP moved for summary judgment, arguing that the defendants should be jointly and severally liable for all of the environmental response costs. In total, those costs were $932,580.12, through November 2015. The most significant charges were payments for electricity amounting to $818,730.50 through June 2009, before Trainer acquired the Site. PADEP also bore other response costs after Trainer took ownership.

The District Court granted summary judgment in part and denied it in part. The Court noted that PADEP's claims

against Halkias and Hunter were based on a theory of piercing Trainer's corporate veil, so the initial question it sought to answer, and the question before us in this interlocutory appeal, is whether Trainer was liable for violations of CERCLA and HSCA. With respect to CERCLA liability, "the Court [held] [Trainer] liable for any response costs incurred after [Trainer] took ownership of the Site, but not for costs incurred beforehand." (App. at 99-100.) As to CERCLA damages, it denied summary judgment because there was a genuine dispute of material fact concerning the amount of damages for which Trainer was liable. The Court reached the same conclusions with respect to HSCA liability and damages.

PADEP disagreed with the District Court's decision to grant summary judgment only in part. It sought an order certifying for interlocutory appeal the issue of whether federal and Pennsylvania law "make an owner liable for response actions and response costs attributable to an identified release of hazardous substances which continues at the time of that person's ownership, regardless of when such actions or response costs were taken or incurred." (App. at 114-15.) The District Court granted certification, and PADEP then petitioned us for permission to appeal, which we gave pursuant to 28 U.S.C. § 1292(b).

## II.    STATUTORY BACKGROUND

### A.    CERCLA

"Congress enacted CERCLA 'to promote the timely cleanup of hazardous waste sites and to ensure that the costs of such cleanup efforts were borne by those responsible for

8

the contamination.'" *Litgo N.J. Inc. v. Comm'r N.J. Dep't of Envtl. Prot.*, 725 F.3d 369, 378 (3d Cir. 2013) (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556 U.S. 599, 602 (2009)). Section 107(a)(4)(A) of CERCLA gives states "the right to recover costs incurred in cleaning up a waste site from 'potentially responsible parties' (PRPs)—four broad classes of persons who may be held strictly liable for releases of hazardous substances that occur at a facility." *Litgo N.J. Inc.*, 725 F.3d at 378. Those four classes of PRPs are: the owner or operator of a facility, 42 U.S.C. § 9607(a)(1); anyone who owned or operated the facility when there was a disposal of a hazardous substance, *id.* § 9607(a)(2); anyone who arranged for the disposal or treatment, or arranged for the transport for disposal or treatment, of hazardous substances at the facility, *id.* § 9607(a)(3); and anyone who accepted hazardous substances for transport to sites selected by such persons, *id.* § 9607(a)(4). *United States v. CDMG Realty Co.*, 96 F.3d 706, 713 (3d Cir. 1996). "Once an entity is identified as a PRP, it may be compelled to ... reimburse the [g]overnment for ... past and future response costs." *Burlington*, 556 U.S. at 609.

Our focus here is on the first category of PRPs: "the owner ... of ... a facility[.]" 42 U.S.C. § 9607(a)(1); *accord United States v. Nicolet, Inc.*, 857 F.2d 202, 210 (3d Cir. 1988). We refer to that category of PRP in this appeal as simply the "owner," or, more particularly, the "current owner."[4] *CDMG Realty Co.*, 96 F.3d at 713.

---

[4] While CERCLA does not use the word "current" as a modifier for "owner," we have held that § 107(a)(1) includes "current owners" as potentially responsible parties.

9

In § 107 cost recovery actions, summary judgment on the issue of liability may be appropriate "even when genuine issues of material fact remain as to ... damages." *United States v. Alcan Aluminum Corp.*, 990 F.2d 711, 720 (2d Cir. 1993) ("*Alcan 1993*"). Defendants may be held jointly and severally liable in a cost recovery action, *United States v. Alcan Aluminum Corp.*, 964 F.2d 252, 268 (3d Cir. 1992) ("*Alcan-Butler*"), but they can also seek to limit that liability by demonstrating that the contamination "is divisible and reasonably capable of apportionment[,]" *id.* at 269; *accord Alcan 1993*, 990 F.2d at 721-23.[5]

---

*See, e.g.*, *Litgo*, 725 F.3d at 381*; CDMG Realty Co.* 96 F.3d at 713. And although the statute uses the language "owner and operator[,]" stated in the conjunctive, many courts have concluded that the language should be read in the disjunctive. *See e.g.*, *Commander Oil Corp. v. Barlo Equip. Corp.*, 215 F.3d 321, 328 (2d Cir. 2000) ("It is settled in this circuit that owner and operator liability should be treated separately."); *Long Beach Unified Sch. Dist. v. Dorothy B. Godwin Cal. Living Tr.*, 32 F.3d 1364, 1367 (9th Cir. 1994) ("Like other courts, we read these categories [of 'owner' and 'operator'] in the disjunctive."). We too have described § 107(a)(1) in disjunctive language. *See CDMG Realty Co.*, 96 F.3d at 713 (stating a "current owner or operator of a facility" is a PRP).

[5] There is some disagreement in the case law over whether divisibility is properly addressed at the liability phase or damages phase of a cost recovery action. We have said that it is best to resolve a divisibility inquiry "at the initial liability phase" because "it involves precisely relative degrees of *liability*[,]" *Alcan-Butler*, 964 F.2d at 270 n.29, but the

10

## B.    HSCA

HSCA is Pennsylvania's state law counterpart to CERCLA.  *Cf. In re Joshua Hill, Inc.*, 294 F.3d 482, 489-91 (3d Cir. 2002) (supporting analysis of HSCA claims by relying on analogous CERCLA provisions).  Like CERCLA, HSCA defines classes of persons who are legally liable for a release or threatened release of hazardous substances, and the owner of a contaminated site is one such person.  35 Pa. Stat. § 6020.701(a).    A current owner is strictly liable for environmental response costs, including those incurred by the Commonwealth of Pennsylvania.    *Id.*    § 6020.702(a). Although CERCLA and HSCA have differences, there are instances in which "liability under ... HSCA mirrors liability under CERCLA" because "§ 702(a) of ... HSCA mirrors § 107(a) of CERCLA." *Agere Sys., Inc. v. Adv. Envtl. Tech. Corp.*, 602 F.3d 204, 236 (3d Cir. 2010).  In this matter, no one asserts that owner liability under CERCLA § 107(a) and under HSCA §§ 701 and 702 is anything other than

Second Circuit has questioned that approach, *see Alcan 1993*, 990 F.2d at 723 (stating that approach "may be contrary to the statutory dictates of CERCLA" and instead leaving the choice of when to address divisibility "to the sound discretion of the trial court").  We do not attempt to resolve that disagreement now, however, because no party raised it before the District Court or to us on appeal.  We simply note that nothing we say here with respect to current owner liability under § 107(a)(1) is meant to change our precedent addressing divisibility in a § 107 cost recovery action.

practically the same for all relevant purposes.[6] Therefore, our resolution of Trainer's liability under CERCLA also decides Trainer's liability under HSCA.

## III. DISCUSSION[7]

At the outset, we note that all parties and the District Court agree that Trainer is the owner of the Site and, pursuant to CERCLA § 107(a)(1), is at least liable for environmental

---

[6] Our decision today does not imply that relevant distinctions may not emerge in other cases, but no relevant difference has been suggested to us here.

[7] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1367. We have jurisdiction over this interlocutory appeal pursuant to 28 U.S.C. § 1292(b). "The scope of our review in a permitted interlocutory appeal is limited to questions of law raised by the underlying order. We are not limited to answering the questions certified, however, and may address any issue necessary to decide the appeal." *Bartnicki v. Vopper*, 200 F.3d 109, 114 (3d Cir. 1999).

"We review the grant or denial of a motion for summary judgment de novo," *id.*, and "apply[] the same standard employed by the district court[,]" *Trinity Indus., Inc. v. Chi. Bridge & Iron Co.*, 735 F.3d 131, 134 (3d Cir. 2013). "Summary judgment is appropriate only if, after drawing all reasonable inferences in favor of the non-moving party," which in this case is Trainer, "there exists 'no genuine dispute as to any material fact.'" *Trinity Indus., Inc. v. Greenlease Holding Co.*, --- F.3d ---, No. 16-1994, 2018 WL 4324261, at *19 (3d Cir. Sept. 11, 2018) (citation omitted).

12

response costs incurred after it took ownership**.**  Taking that concession as our starting point, our task is to decide whether the meaning of "all costs" in § 107(a) includes response costs incurred before Trainer acquired the Site.  We conclude that, given the structure and text of CERCLA, a current owner under § 107(a)(1) is indeed liable for all response costs, whether incurred before or after acquiring the property.

"Statutory interpretation, as we always say, begins with the text."  *Rotkiske v. Klemm*, 890 F.3d 422, 424-25 (3d Cir. 2018) (en banc) (quoting *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016)).  We derive the "legislative intent of Congress ... from the language and structure of the statute itself[.]" *United States v. Lanier*, 520 U.S. 259, 267 n.6 (1997).  We therefore begin our analysis by looking at the text of the CERCLA provision that makes a current owner liable for response costs and then consider that provision's place within the larger framework of the statute.

Section 107(a) provides that "the owner ... of ... a facility ... shall be liable for ... all costs of removal or remedial action incurred by ... a State ... not inconsistent with the national contingency plan[.]"  42 U.S.C. § 9607(a); *accord Nicolet*, 857 F.2d at 210.  That is a statement of remarkable breadth, but a statute may be broad in scope and still be quite clear.  *See In re Phila. Newspapers, LLC*, 599 F.3d 298, 310 (3d Cir. 2010), *as amended* (May 7, 2010). The term "all costs" means just that; it does not distinguish between costs that were incurred before ownership and those incurred afterwards.  Because there is no such distinction, there is no temporal limitation on the liability for costs.  If Congress had intended for "all costs" to mean anything less than "all," we assume it would have so specified.  The plain

13

text thus leads us to conclude that the words "all costs" include costs incurred before ownership and costs incurred after ownership.

The structure of CERCLA, as amended, reinforces that reading of the statute. "The Supreme Court has stated consistently that the text of a statute must be considered in the larger context or structure of the statute in which it is found." *United States v. Tupone*, 442 F.3d 145, 151 (3d Cir. 2006). And "[w]here Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." *TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001) (citation omitted). CERCLA already provides a number of potential limits on PRP liability. There are statutes of limitations for § 107 cost recovery actions, 42 U.S.C. § 9613(g)(2),[8] the innocent owner defense to § 107(a) liability, *id.* §§ 9601(35)(A), 9607(b)(3); *CDMG Realty Co.*, 96 F.3d at 716 & n.6,[9] and the bona fide prospective

---

[8] An initial cost recovery action under § 107 "must be commenced ... for a removal action, within 3 years after completion of the removal action, ... and ... for a remedial action, within 6 years after initiation of physical on-site construction of the remedial action[.]" 42 U.S.C. § 9613(g)(2).

[9] "To establish the innocent owner defense, the defendant must show that 'the real property on which the facility is located was acquired by the defendant after the disposal or placement of the hazardous substance on, in, or at the facility' and that '[a]t the time the defendant acquired the facility the defendant did not know and had no reason to

14

purchaser defense to § 107(a)(1) current owner liability, 42 U.S.C. §§ 9601(40), 9607(r).[10]  We therefore decline to read an additional limitation into the statute by imposing a new temporal frame on the meaning of "all" in the term "all costs."

Moreover, the provision in CERCLA for contribution actions, § 113(f), also supports reading "all costs" to include costs incurred before a current owner acquired a property.  *Id.* § 9613(f).   Through § 113(f), response costs can be reassigned to a more culpable party.  *Id.*; *see Litgo N.J. Inc.*, 725 F.3d at 383 ("After identifying PRPs, courts allocate response costs based on equitable factors.").   When

---

know that any hazardous substance which is the subject of the release or threatened release was disposed of on, in, or at the facility.'"   *CDMG Realty Co.*, 96 F.3d at 716 & n.6 (alteration in original) (citing 42 U.S.C. §§ 9601(35)(A), 9607(b)(3)).

[10]   A bona fide prospective purchaser is one who, among other things, has "made all appropriate inquiries into the previous ownership and uses of the facility" and "exercises appropriate care with respect to hazardous substances found at the facility[.]"   42 U.S.C. § 9601(40). Such a purchaser "shall not be liable" as "an owner or operator of a facility" under § 107(a)(1) "as long as [it] does not impede the performance of a response action or natural resource restoration."   *Id.* § 9607(r)(1).  The statute further provides that, even if a new owner qualifies as a bona fide prospective purchaser, the new owner would not be entitled to a windfall profit.  *Id.* **§** 9607(r)(2)-(3).

15

apportioning cleanup costs, courts consistently pay attention to who has participated in response efforts without slowing or interfering with that process. *See, e.g.*, *id.* at 383, 388-89 (citing cases when cooperative PRP current owners were apportioned 0%, 5%, and 10% of remediation costs). Thus, when a PRP must bear "more than its fair share" of cleanup costs resulting from a § 107 cost recovery action, it can seek a more equitable distribution of those costs through a contribution action against other PRPs. *United States v. R.W. Meyer, Inc.*, 889 F.2d 1497, 1506-08 (6th Cir. 1989).

Finally, the Small Business Liability Relief and Brownfields Revitalization Act of 2002, Pub. L. No. 107-118, 115 Stat. 2356 (codified at 42 U.S.C. §§ 9601, 9607), provides logical support for the conclusion that a current owner is liable for response costs incurred before the change in ownership of the property.[11] As just noted, *see supra* note 8, Congress added a provision from that Act – the bona fide prospective purchaser defense – to CERCLA to allow a prospective purchaser to be exempted from § 107(a)(1) liability, if that purchaser, among other requirements, "made all appropriate inquiries into the previous ownership and uses of the facility" and "exercise[d] appropriate care with respect to hazardous substances found at the facility[.]" 42 U.S.C. § 9601(40). But that defense is limited because even a careful prospective purchaser is not totally off the hook – the amendment allows the United States to obtain a lien on the property for its "unrecovered response costs." *Id.*

---

[11] The District Court noted in its order certifying the interlocutory appeal that the bona fide prospective purchaser defense "might support [PADEP]'s position." (App. at 157 (emphasis omitted).)

16

§ 9607(r)(2). No one has invoked the defense here, and, in any event, it allows only the United States to obtain a lien, while in this instance Pennsylvania is the one seeking to recover response costs. Nevertheless, that provision, by its very existence, indicates that Congress contemplated scenarios in which a current owner could be liable for response costs incurred before ownership transferred.

Therefore, based on CERCLA's text and structure, the meaning of "all costs" in § 107(a) includes costs incurred both before and after a current owner acquired the property.[12]

----

[12] The District Court concluded otherwise based on *California Department of Toxic Substances Control v. Hearthside Residential Corp.*, 613 F.3d 910 (9th Cir. 2010), but that decision gives no guidance as to the meaning of "all costs" in § 107(a). Rather, the *Hearthside* court addressed which of two entities was a current owner of a property for purposes of § 107(a)(1). 613 F.3d at 911-12. One was a corporation that had owned the property while all cleanup costs were incurred, and the other was the state's land commission that owned the property at the time the lawsuit was filed but not at any time when costs had been incurred. *Id.* at 912. The court held that an owner of a property at the time cleanup costs are incurred cannot avoid liability for such costs by selling the property prior to the filing or initiation of a response action by the government and, therefore, that the party who owned the property at issue at the time the cleanup costs were incurred was a responsible party. *Id.* at 911, 916. *Hearthside* does not stand for the proposition that it is permissible to temporally partition § 107(a)(1) liability with respect to cleanup costs. Here, because Trainer "[did] not dispute that [it], as the owner and operator of the Site, [was] a

17

As mentioned at the outset, that means that Trainer is liable for the removal costs at the Site regardless of when those costs were incurred. And because we conclude that Trainer is liable under CERCLA, we also conclude that it is liable under HSCA. *See supra* Section II.B.[13]

---

responsible party under CERCLA[,]" (App. at 94); *see supra* Section III, there was no need to turn to *Hearthside* to determine again whether Trainer was a current owner of the Site.

[13] Specifically, as under CERCLA, there is no ambiguity under HSCA that Trainer is liable for all response costs, including those incurred prior to its ownership. First, Trainer is a "responsible person" because it "own[ed] or operate[d] the site" (1) "when a hazardous substance [wa]s placed or [came] to be located in or on the site," § 6020.701(a)(1)(i), or (2) "during the time of the release or threatened release," *id.* § 60020.701(a)(1)(iii). There were hazardous substances located on the site at the time Trainer took ownership and there has been a release or threatened release since that time. Second, a responsible person is "strictly liable for response costs and damages which result from the release or threatened release of hazardous substances," *id.* § 6020.702(a), which includes "[r]easonable and necessary or appropriate costs of remedial response incurred by the United States [or] the Commonwealth." *id.* § 6020.702(a)(2). Here, PADEP has incurred "[r]easonable and necessary or appropriate costs of remedial response," *id.* § 6020.702(a)(2), resulting from the release or threatened release. Third, exceptions to responsible party status do not apply because at least one of the defendants knew or had reason to know "a hazardous substance which is the subject

18

Nothing in our decision today regarding liability for "all costs" is meant to affect established precedent concerning CERCLA damages. How exactly damages are assessed against or apportioned among PRPs in any particular case is a matter to be decided according to existing statutory and decisional law.

## IV. CONCLUSION

For the foregoing reasons, we will affirm in part, vacate in part, and remand for further proceedings. We will affirm the District Court's order that Trainer is liable under CERCLA and HSCA for PADEP's response costs incurred after it acquired the Site, but we will vacate the District Court's order with respect to Trainer's liability for PADEP's response costs incurred before acquisition of the Site. Given that disposition, we do not need to address the remaining aspects of the District Court's decision. The matter is remanded for further proceedings consistent with this opinion.

---

of the release or threatened release was disposed of on, in, or at the site." *id.*§ 6020.701(b)(vi)(A).